IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-00014-RM-NRN

DARREL ALAN HYBERG, JR.,

Plaintiff,

v.

KEN ENSLOW,
TOM RITTENHOUSE,
TIM QUINN, and
MIKE CUNNINGHAM,

Defendants.

---

## REPORT AND RECOMMENDATION ON
## DEFENDANTS' MOTION TO DISMISS (DKT. #16)
## AND PLAINTIFF'S REQUEST FOR LEAVE TO AMEND (DKT. #30)

---

N. Reid Neureiter
United States Magistrate Judge

This matter is before the Court on Defendants' Motion to Dismiss (Dkt. #16),

referred by Judge Raymond P. Moore (Dkt. #18). In their motion, Defendants seek

dismissal of the five claims brought against them in their individual capacities by pro se[1]

Plaintiff Darrell Alan Hyberg, Jr. pursuant to 42 U.S.C. § 1983. The Court has carefully

considered the motion and Mr. Hyberg's Response, in which Mr. Hyberg also requests

---

[1] The Court must construe the filings of pro se litigants liberally. *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). However, the Court should not be the pro se litigant's advocate, nor should the Court "supply additional factual allegations to round out [the pro se litigant's] complaint or construct a legal theory on [his] behalf." *See Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997) (citing *Hall*, 935 F.2d at 1110). In addition, pro se litigants must follow the same procedural rules that govern other litigants. *Nielson v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994).

leave to amend. (Dkt. #30 at 15.[2]) The Court has taken judicial notice of the Court's file, considered the applicable Federal Rules of Civil Procedure and case law, and for the following reasons RECOMMENDS that Defendants' Motion to Dismiss be GRANTED, and that Mr. Hyberg's request for leave to amend be DENIED.

## I. BACKGROUND

The following facts are taken from Mr. Hyberg's Prisoner Complaint (Dkt. #1) and attachments thereto, and are presumed to be true for purposes of this Recommendation.

Mr. Hyberg is an inmate in the custody of the Colorado Department of Corrections (CDOC), and is currently confined at the Sterling Correctional Facility ("SCF"). All Defendants are SCF employees.

Mr. Hyberg works at SCF's Colorado Correctional Industries Seating Factory ("CCI"). Mr. Hyberg alleges he has been subject to numerous unconstitutional strip searches when entering or leaving his job at CCI. Specifically, he asserts these strip searches have been conducted in view of other inmates and/or staff, violating his Fourth Amendment right not to be subject to a public strip search unassociated with any legitimate penological interest. Mr. Hyberg also argues these strip searches violated CDOC Administrative Regulation 300-06, and that the Defendants maliciously disregarded this regulation.

---

[2] Technically, Mr. Hyberg's request in his response is improper pursuant to D.C.COLO.LCivR 7.1(d), which prohibits including a motion in either a response or reply to an original motion. Given his pro se status, however, and in the interests of judicial economy, the Court will nonetheless address Mr. Hyberg's request.

Mr. Hyberg alleges the illegal strip searches are particularly embarrassing for him because he has deformed and feminine looking breasts, a condition known as gynecomastia.[3] Mr. Hyberg believes that smoking marijuana as a child and post pubescent teenager caused this condition. Mr. Hyberg also asserts these illegal strip searches have put him "at risk of being targeted by other inmates after they saw his naked body and the appearance of female breasts."

In his complaint, Mr. Hyberg alleges two specific searches were unconstitutional: one conducted by Defendant Ken Enslow on January 24, 2017 in a "booth" or "cubicle" located in the area designated for strip searches (the strip out area), and one conducted by Defendant Tim Quinn on April 18, 2017 in a "booth" or "cubicle" in the strip out area with a curtain (after the January 24, 2017 search, the strip out area was demolished and the cubicles rebuilt, one with a curtain). Defendant Tom Rittenhouse ordered both searches. Mr. Hyberg completed the three-step grievance process with respect to both searches. These grievances were denied.

According to Mr. Hyberg, the January 24, 2017 search took place "in front of" three other inmates. Mr. Hyberg alleges that during the April 18, 2017 search, Mr. Quinn retaliated against him for filing a grievance relating to the January 24 search by "purposely and maliciously" allowing one other inmate to view the search, and making a derogatory statement to him: "You get the cubicle with the curtain, Just for you," thereby violating Mr. Hyberg's First Amendment rights.

---

[3] In his Complaint, Mr. Hyberg refers to "gynoclomastia," but according to the Mayo Clinic's website, the correct spelling is gynecomastia. *See* https://www.mayoclinic.org/diseases-conditions/gynecomastia/symptoms-causes/syc-20351793.

## II. LEGAL STANDARDS

### A. Pro Se Plaintiff

Mr. Hyberg is proceeding *pro se.* The court, therefore, "review[s] [his] pleadings and other papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys." *Trackwell v. United States,* 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted). *See also Haines v. Kerner,* 404 U.S. 519, 520–21 (1972) (holding allegations of a *pro se* complaint "to less stringent standards than formal pleadings drafted by lawyers"). However, a *pro se* litigant's "conclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based." *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir. 1991). A court may not assume that a plaintiff can prove facts that have not been alleged, or that a defendant has violated laws in ways that a plaintiff has not alleged. *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519, 526 (1983). *See also Whitney v. New Mexico,* 113 F.3d 1170, 1173–74 (10th Cir. 1997) (court may not "supply additional factual allegations to round out a plaintiff's complaint"); *Drake v. City of Fort Collins,* 927 F.2d 1156, 1159 (10th Cir. 1991) (the court may not "construct arguments or theories for the plaintiff in the absence of any discussion of those issues"). Mr. Hyberg's *pro se* status does not entitle him to application of different rules. *See Montoya v. Chao,* 296 F.3d 952, 957 (10th Cir. 2002).

### B. Failure to State a Claim Upon Which Relief Can Be Granted

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's

complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.,* 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and quotation marks omitted).

"A court reviewing the sufficiency of a complaint presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hall,* 935 F.2d at 1198. Notwithstanding, the court need not accept conclusory allegations without supporting factual averments. *Southern Disposal, Inc., v. Texas Waste,* 161 F.3d 1259, 1262 (10th Cir. 1998). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff has pled facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Moreover, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (citing *Twombly*, 550 U.S. at 555, 557) (internal citation omitted).

The *Iqbal* evaluation requires two prongs of analysis. First, the court identifies "the allegations in the complaint that are not entitled to the assumption of truth," that is,

those allegations which are legal conclusion, bare assertions, or merely conclusory. *Id.* at 680. Second, the Court considers the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id.* at 679. But "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* at 678 (citation omitted).

In making the required determination, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). *See also Utah Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249, 1253-54 (10th Cir. 2005) ("[A] document central to the plaintiff's claim and referred to in the complaint may be considered in resolving a motion to dismiss, at least where the document's authenticity is not in dispute."). "[F]actual allegations that contradict . . . a properly considered document are not well-pleaded facts that the court must accept as true." *GFF Corp. v. Associated Wholesale Grocers*, 130 F.3d 1381, 1385 (10th Cir. 1997).

## C. Qualified Immunity

The doctrine of qualified immunity shields government officials from individual liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is "an immunity from

suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001).

Although qualified immunity is most often raised at the summary judgment stage, the Tenth Circuit has recognized the propriety of raising a qualified immunity defense in a motion to dismiss. *See Pueblo Neighborhood Health Ctr., Inc. v. Losavio*, 847 F.2d 642, 645-46 (10th Cir. 1988). Once the defense is asserted, the burden shifts to the plaintiff to establish 1) that the defendant's actions violated a federal constitutional or statutory right and 2) that the federal right was clearly established at the time of the challenged conduct. *PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1196 (10th Cir. 2010). *See also Losavio*, 847 F.2d at 646.

While the plaintiff bears this burden, at the motion to dismiss stage, well-pleaded factual allegations are taken as true, although the court must consider whether they plausibly give rise to a claim for relief. *Weise v. Casper*, 593 F.3d 1163,1166 (10th Cir. 2010). The plaintiff first must establish that his allegations, taken in the light most favorable to plaintiff, show that the officer's conduct violated a constitutional right. *Saucier*, 533 U.S. at 201. If the plaintiff establishes a violation of a constitutional or statutory right, "the next, sequential step is to ask whether the right was clearly established." *Id.* This determination must be made "in light of the specific context of the case, not as a broad general proposition." *Id.* "[T]he relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202. If the plaintiff fails to satisfy either part of this "heavy

two-part burden," the court must grant the defendant qualified immunity and dismiss the deficient claims.

The United States Supreme Court has altered somewhat the analytical process outlined in *Saucier*, holding that the sequence of the analysis is no longer mandatory. *Pearson v. Callahan*, 555 U.S. 223 (2009). The judges of the district courts and the courts of appeals are now permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. *Id.* at 236. The Supreme Court noted, however, that the sequence set forth in *Saucier* often is the appropriate analytical sequence. *Id.*

### III.  ANALYSIS

In their motion to dismiss, Defendants argue Mr. Hyberg has failed to: (1) allege personal participation by Defendants Rittenhouse and Cunningham; (2) state plausible Fourth Amendment claims against any of the Defendants; (3) state a plausible First Amendment retaliation claim; and (4) state viable claims for compensatory or punitive damages under the Prison Litigation Reform Act (PLRA). Defendants also argue they are entitled to qualified immunity. I will address each of these arguments, beginning with whether Mr. Hyberg has stated a plausible Fourth Amendment claim.

### A. Mr. Hyberg's Fourth Amendment Claim for Alleged Unconstitutional Strip Searches is not Plausibly Pled

The crux of Mr. Hyberg's complaint is that the Defendants conducted unconstitutional strip searches that violated his Fourth Amendment rights because even though the searches took place in a designated strip search area of the prison, other

male "stripping inmates" were present during those searches and either could, or actually did, view him while he was being strip searched.

It has long been recognized that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285 (1948). In the context of strip searches, "[a]lthough the inmates' right to privacy must yield to the penal institution's need to maintain security, it does not vanish altogether." *Cumbey v. Meachum*, 684 F.2d 712, 714 (10th Cir. 1982). The Fourth Amendment, however, "prohibits only unreasonable searches." *Bell v. Wolfish*, 441 U.S. 520, 558 (1979). In the Tenth Circuit, it is well established that "the Constitution does not require 'complete privacy' for a strip search." *Smith v. Trapp*, No. 14-3220-JAR-JPO, 2018 WL 587230, *4 (D. Kan. Jan. 29, 2018) (quoting *Daughtery v. Harris*, 476 F.2d 292, 294 (10th Cir. 1973)).

Determining the reasonableness or "constitutionality of a strip search 'requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.'" *Farmer v. Perrill*, 288 F.3d 1254, 1259 (10th Cir. 2002) (quoting *Bell*, 441 U.S. at 559 (1979)). Although the "test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," in making this determination, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell*, 441 U.S. at 559.

In *Farmer*, the plaintiff, a pre-operative, male-to-female transsexual, claimed that strip searches of her "conducted in an open area in full view of all other [male] inmates

9

and a number of staff" violated her constitutional rights. 288 F.3d at 1258. The Tenth Circuit affirmed Judge Wiley's denial of the defendants' motion for summary judgment based on disputed fact issues as to whether the searches were conducted in an "open area." *Id.* In other cases in which inmates allegedly were strip searched in the presence of (or by) members of the opposite sex, courts also have been reluctant to dismiss the inmates' Fourth Amendment claims. *See, e.g.*, *Hayes v. Marriott*, 70 F.3d 1144, 1146-47 (10th Cir. 1995) (recognizing that prisoners "retain a limited constitutional right to bodily privacy, *particularly* as to searches viewed or conducted by members of the opposite sex," and rejecting district court's conclusion that a "'single or minimal viewing' of a prisoner by prison officials of the opposite sex is insufficient as a matter of law to constitute a Fourth Amendment violation.") (emphasis added).[4] In *Hayes*, the plaintiff alleged "he was subjected to a body cavity search in the presence of over 100 people, including female secretaries and case managers from other buildings." *Id.* at 1147.

Although a female or transgender inmate's chest is deemed an "intimate part" that is protected from being viewed during a strip search, the same is not true with respect to a male inmate's chest, i.e., a male inmate has no constitutional right to have his chest protected from being viewed during a strip search. (Dkt. #16 at 8-9, citing AR 300-06(III)(N), which cites Colo. Rev. Stat. § 18-3-401(2).) Attached to Mr. Hyberg's Complaint is a "Request for Legal Assistance," in which he acknowledges that the CDOC is to use screens or other privacy barriers during strip searches to "prevent the intimate parts . . . of the inmate being searched from being exposed to other inmates, or

---

[4] The *Hayes* court did recognize, however, that "the Fourth Amendment does not require the complete exclusion of members of the opposite sex from areas in which searches are conducted." 70 F.3d at 1148.

CDOC staff members not conducting or supervising the search or providing security for the search," *and* that "'breasts' are considered to be intimate parts of female and trangendered [sic] inmates, *but not male inmates*." (Dkt. #1-1 at 22) (emphasis added.)

Here, Mr. Hyberg acknowledges that he "can be subjected to a strip search every time he enters or leaves the Seating Factory at the beginning or end of his shift." (Dkt. #1 ¶ 2.) He also acknowledges that strip searches at SCF are conducted in a "strip out area" that has "booths or cubicles," in which one inmate at a time goes in to be searched. (*Id.* ¶¶ 23-24.) Mr. Hyberg alleges, however, that the "booths or cubicles provide no real privacy due to the height of the walls, the depth of the walls and no screens or privacy barriers were [sic] provided." (*Id.* ¶ 24.) Thus, when Mr. Hyberg was strip-searched, other inmates and/or staff in the strip out area would be able to see his breasts, which appear feminine due to his gynecomastia, a condition which makes the strip searches "embarrassing and invasive" for Mr. Hyberg. (*Id.* ¶¶ 24, 14-15.)

Concerning his January 24, 2017 strip search, Mr. Hyberg alleges he was "naked, in front of [three] other inmates," and that he also "was forced to get dressed in front of the other inmates" before leaving the strip out area. (*Id.* ¶¶ 29-30.) His grievances, however, which he attached to his complaint and specifically referred to in his response (Dkt. #30 at 1), simply state that "[o]ther staff were *in eyesight of* strip out as were other inmates"; specifically, two other inmates who were "finishing up" their own strip searches, one of whom was "wash[ing] his hands at a sink in clear view of me and others stripping." (Dkt. #1-1 at 28 (informal grievance), at 29 (step one grievance), and at 30 (step two grievance) (emphasis added).) The affidavit of one of these inmates confirms the strip out area has four booths, each of which "is approximately 3 feet

deep," with "dividing walls [that] came up just below chest level." (*Id.* at 32 ¶¶ 8-9.) That inmate, Chris Wells, even provided a very helpful diagram showing the entry to the strip out area (from which no inmate being searched would be visible), the four booths (all of which, because they are in a straight line, provide privacy, at least from below the chest and down, from the other booths), and the sink, which is adjacent to booth one, and from which an inmate who is washing his hands after being searched might conceivably be able to partially see another inmate being searched if he turned his head while standing at the sink.

As for his April 17, 2017 strip search, Mr. Hyberg alleges that "again three other inmates were in the common area used for strip outs," that he entered a cubicle in which a curtain had been installed earlier that day, and that Mr. Quinn said to him, "You get the cubicle with the curtain, Just for you." (Dkt. #1 ¶¶ 54-57.) Mr. Hyberg also alleges that Mr. Quinn "stepped back three feet from the cubicle" in which Mr. Hyberg was being strip searched, which allowed another inmate (who presumably had just been or was about to be searched in another cubicle) "to walk past between [Mr.] Quinn and Mr. Hyberg's naked body." (*Id.* ¶ 62.) The other inmate "was caught off guard and surprised," and "raised his hands and said 'WHOA-WHOA-WHOA' as he was leaving the strip out area to block his view of Mr. Hyberg's naked body." (*Id.* ¶¶ 64-65.) According to Mr. Hyberg, Mr. Quinn's conduct, in stepping back from the cubicle so the other inmate could walk by, was "malicious." (*Id.* ¶ 62.) Mr. Hyberg believes this to be the case because Mr. "Quinn in previous strip outs that day was stopping inmates from walking past cubicles where someone was naked." (*Id.* ¶ 66.)

Taking the above facts as true, which I must do for purposes of evaluating a Rule 12(b)(6) motion, I will evaluate them in light of the four factors set forth in *Bell*.

**1. The Scope of and Justification for the Searches**

Mr. Hyberg was subjected to a "routine strip search," not a body cavity search. (Dkt. #30 at 2.) Although Mr. Hyberg argues the search was "extremely invasive," because it involved more than simply taking off his clothes, his primary argument is that he was forced "to endure a strip search in front of other inmates" when there was no emergency to justify it. (*Id.* at 7-8.) Mr. Hyberg relies on cases such as *Shapiro v. Rynek*, 212 F. Supp. 3d 990 (D. Colo. 2016), to argue he is protected "from group strip searches without sufficient justification," and that he may not be strip searched "in front of other inmates unless it is an emergency." (Dkt. #30 at 7.) *Shapiro* involved an alleged mass strip search of eleven inmates who "stood naked together in the pre-transport holding cell" and were "simultaneously strip searched, with no privacy screens or barriers." *Id.* at 993-94. The facts as alleged by Mr. Hyberg, however, do not describe a "group strip search" such as that contemplated by *Shapiro*.

Mr. Hyberg also does not take issue with the propriety of his being strip searched either before or after his work shift at CCI (Dkt. #1 ¶ 2), nor does he allege that its scope was beyond what would normally occur during such a search (e.g., he does not allege that any Defendant touched him). Mr. Hyberg does not have a constitutional right to "complete privacy" when he is strip searched, *Daughtery*, 476 F.2d at 294, nor does he have a constitutional right to protect his chest from being viewed during his strip searches. (Dkt. #16 at 8-9; Dkt. #1-1 at 22.)

## 2. The Manner and Place in which the Searches were Conducted

Mr. Hyberg does not allege that he was strip searched in a public area of the prison, or that anyone of the opposite sex could see or saw him during the strip searches. He acknowledges that the strip searches were conducted in a designated "strip out area" with booths or cubicles. (Dkt. #1 ¶ 23.) Although Mr. Hyberg alleges that the booths or cubicles "provided no real privacy due to the height of the walls, the depth of the walls and no screens or privacy barriers," this again amounts to Mr. Hyberg not being provided with "complete privacy," to which he does not have a constitutional right. *Daughtery*, 476 F.2d at 294. As for the height of the walls, Mr. Hyberg is embarrassed to have his chest seen by others, but as a male inmate he is not entitled to privacy vis-à-vis his chest.

The designated strip out area, with four cubicles or booths, is not analogous to the open area in which the transgender inmate in *Farmer* alleged she was strip searched "in full view of all other inmates and a number of staff," 288 F.3d at 1258, or the public area in *Hayes* in which the inmate allegedly was subjected to a body cavity search "in the presence of female corrections officers as well as 'several nonessential personnel' such as case managers and secretaries," and "while 100 people watched." 70 F.3d at 1145. The circumstances in which Mr. Hyberg was searched also are a far cry from those in *Shapiro*, where eleven inmates "stood naked together" and were "simultaneously strip searched, with no privacy screens or barriers." 212 F. Supp. 3d at 993-94. Here, Mr. Hyberg describes a non-public, non-open area in which a maximum of four inmates may be strip-searched at the same time in booths or cubicles all of which have dividing walls that come up just below an inmate's chest level.

Bearing in mind that "courts must defer to the judgment of correctional officials unless the record contains substantial evidence showing their policies are un unnecessary or unjustified response to problems of jail security," *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 323 (2012), and that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system, *Price v. Johnston*, 334 U.S. 266, 285 (1948), I conclude that Mr. Hyberg's complaint does not plausibly state a Fourth Amendment claim based on alleged unconstitutional strip searches, during which other male inmates or prison staff may have briefly seen him naked, or seen his feminine-looking chest, and therefore I RECOMMEND that Defendants' motion to dismiss Claims One through Four be GRANTED.

In addition, even if Mr. Hyberg had plausibly pled a Fourth Amendment claim, Claims Three and Four would still fail.

## B. Personal Participation of Defendants Rittenhouse and Cunningham— Claims Three and Four

Individual liability under § 1983, regardless of the constitutional theory, must be based on personal involvement. *See Foote v. Spiegel,* 118 F.3d 1416, 1423–24 (10th Cir. 1997); *Mitchell v. Maynard,* 80 F.3d 1433, 1441 (10th Cir. 1996) (personal participation is an essential allegation in a civil rights action); *Bennett v. Passic,* 545 F.2d 1260, 1262–63 (10th Cir. 1976) ("Personal participation is an essential allegation in a § 1983 claim."). A defendant may not be held liable merely because of his or her supervisory position. *Grimsley v. MacKay,* 93 F.3d 676, 679 (10th Cir. 1996). "Section 1983 does not authorize liability under a theory of *respondeat superior*, *i.e.* vicarious liability." *Schneider v. City of Grand Junction Police,* 717 F.3d 760, 767 (10th Cir. 2013)

(citation omitted). "For this reason, the Supreme Court has suggested the term 'supervisory liability' is 'a misnomer.'" *Id.* (quoting *Iqbal,* 556 U.S. at 677). "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal,* 556 U.S. at 677.

A plaintiff therefore must show an "affirmative link" between the supervisor and the constitutional violation. *Dodds v. Richardson,* 614 F.3d 1185, 1199 (10th Cir. 2010). "This requires, for example, more than 'a supervisor's mere knowledge of his subordinate's' conduct." *Schneider,* 717 F.3d at 767 (quoting *Iqbal* 556 U.S. at 667). Instead, a plaintiff must show three elements to hold a defendant liable under § 1983 based on his or her supervisory responsibilities: (1) personal involvement, (2) causation, and (3) state of mind. *Id.*

As to the first prong, "[i]ndividual liability under § 1983 must be based on [the defendant's] personal involvement in the alleged constitutional violation." *Foote,* 118 F.3d at 1423. As *Iqbal* explained, "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own actions, has violated the Constitution." 556 U.S. at 676.

According to Mr. Hyberg's complaint, neither Mr. Rittenhouse nor Mr. Cunningham personally participated in or were even present during either the January 24 or April 17, 2017 searches.[5] His claims against both men are based on Mr. Hyberg's contention that each was aware of the searches, knew they were illegal, and knew Mr. Hyberg had filed grievances in relation to them. The Court finds that Mr. Hyberg's

---

[5] Mr. Hyberg conclusorily asserts that Mr. Rittenhouse "participated in many of the[] illegal strip searches" other than those that occurred on January 24 and April 17, 2017, but he provides no factual support for this statement. (Dkt. #1 at 6 ¶ 15, and at 15 ¶ 86.)

allegations fail to establish that either Mr. Rittenhouse or Mr. Cunningham were personally involved in the alleged violation of his constitutional rights, providing an additional basis to dismiss Claims Three and Four.

### 1. Mr. Rittenhouse—Claim Three

In Claim Three, Mr. Hyberg alleges Mr. Rittenhouse knew he was giving Mr. Hyberg an illegal order to be strip searched because he knew the search would be conducted in front of other people. Mr. Hyberg also alleges that Mr. Rittenhouse "admitted the strip out on January 24, 2017, was not in compliance with AR 300-6" because in the response to Mr. Hyberg's Informal Grievance, Mr. Rittenhouse signed the CDOC Informal Resolution Form which, in the "Response from Affected Area or Case Manager" section, included the statement: "For near future, implementation & installation of taller partition walls w/movable curtains enclosing strip out cubicles to meet AR 300-C requirements." (Dkt. #1-1 at 28.)

Mr. Hyberg is not, however, alleging that Mr. Rittenhouse was a supervisor. (Dkt. #30 at 2.) Thus, Mr. Hyberg's claim is based solely on Mr. Rittenhouse's alleged "part" in the January 24 and April 17, 2017 searches. (*Id.*) According to Mr. Hyberg, because Mr. Rittenhouse "was well aware of the nature of the strip search area" when he ordered Mr. Hyberg to be strip searched on January 24 and April 17, he essentially "was ordering [Mr. Hyberg] to submit to a strip search in front of other people." (*Id.* at 3.)

These allegations are too conclusory to plausibly allege Mr. Rittenhouse's personal participation in either the January 24 or April 17, 2017 search. As for Mr. Hyberg's informal grievance, without an allegation of direct responsibility for the alleged violations, Mr. Rittenhouse cannot be held liable simply because he responded to a

grievance. *Rosales v. Ortiz*, No. CIVA06CV-2438EWN-CBS, 2008 WL 877173, at *7 (D. Colo. Mar. 27, 2008), *aff'd*, 325 F. App'x 695 (10th Cir. 2009) (defendant could not be liable on basis that he denied or participated in processing grievance).

### 1. Mr. Cunningham—Claim Four

Mr. Hyberg relies on Mr. Cunningham's position as "the supervisor of Defendant Enslow, Rittenhouse and Quinn," alleging he failed to properly train his staff on how to conduct lawful strip searches. (Dkt. #1 at 17 ¶¶ 92-95.) He alleges the January 24 and April 17, 2017 illegal searches were "brought to [Mr.] Cunningham's attention when Mr. Hyberg filed an informal Grievance concerning these violations," and that Mr. Cunningham "knew the strip out cubicles were not in compliance with CDOC policy." (*Id.* ¶¶ 96-97.) Mr. Hyberg also asserts that Mr. Quinn blamed Mr. Cunningham for not advising him about the change in strip search policy that occurred in 2012.

*Iqbal* clearly forecloses liability based on Mr. Cunningham's "awareness" of the allegedly illegal strip searches, even assuming the allegation is true. 556 U.S. at 677 (a "supervisor's mere knowledge of his subordinate's" unconstitutional conduct is insufficient to establish a § 1983 claim). Mr. Cunningham also cannot be liable simply because he knew about Mr. Hyberg's grievances. *Rosales*, 2008 WL 877173, at *7.

For Mr. Hyberg to establish individual liability on Mr. Cunningham's part based on failure to train, he must show: (1) an underlying violation of his constitutional rights; (2) Mr. Cunningham's personal involvement caused the misconduct complained of; and (3) Mr. Cunningham acted with the state of mind or intent requires to establish he committed a constitutional violation. *Kemp v. Lawyer*, 846 F. Supp. 2d 1170, 1175 (D. Colo. 2012).

"[A] failure to train theory has been seen as a supervisory liability claim that, at bottom, implicates a supervisor's implementation of a policy." *Myers v. Koopman*, No. 09-CV-02802-REB-MEH, 2011 WL 650328, *6 (D. Colo. Feb. 11, 2011) (citing *Dodds*, 614 F.3d at 1209 (Tymkovich, J., *concurring*)). And "supervisory liability under § 1983 is [] only appropriate where the plaintiff can prove that the supervisor *caused* the violation." *Dodds*, 614 F.3d at 1209 (emphasis in original). "[S]pecifically, at a minimum, [Mr. Hyberg must] establish a deliberate and intentional act on the part of [Mr. Cunningham] to violate [Mr. Hyberg's] legal rights." *Kemp*, 846 F. Supp. 2d at 1175. As Chief Judge Tymkovich further explained in his concurring opinion in *Dodds*: "[A] supervisor does not *cause* a violation unless he or she actually intended for his or her subordinates to invidiously discriminate. Mere knowledge and acquiescence of, or even 'deliberate indifference' towards, the discriminatory actions of employees now appears insufficient to prove causation, and thereby prove liability." 614 F.3d at 1210 (emphasis in original).

Because Mr. Hyberg has failed to allege sufficient facts to support his claim that either Mr. Enslow or Mr. Quinn committed an underlying violation of Mr. Hyberg's constitutional rights during either the January 24 or April 17, 2017 strip search, Mr. Hyberg's failure to train claim against Mr. Cunningham fails right out of the gate. But even if I were to conclude that Mr. Hyberg satisfied this first prong, his claim still fails because he has not adequately alleged facts showing that Mr. Cunningham's personal involvement caused the allegedly illegal strip searches, or that Mr. Cunningham acted with the requisite state of mind or intent to establish he committed a constitutional violation.

## C. Mr. Hyberg Fails to State a First Amendment Retaliation Claim against Mr. Quinn—Claim Five

"Prison officials may not retaliate against or harass an inmate because of the inmate's exercise of his constitutional rights." *Dawson v. Audet*, 636 F. App'x 753, 755-56 (10th Cir. 2016) (quoting *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir.1998)). In particular, officials may not retaliate against prisoners for filing administrative grievances. *Id.* (citing *Gee v. Pacheco*, 627 F.3d 1178, 1189 (10th Cir. 2010)). That said, "retaliation claims in a prison context are viewed with 'skepticism because [e]very act of discipline by prison officials is by definition retaliatory in the sense that it responds directly to prisoner misconduct,'" and therefore, "[a]n inmate claiming retaliation must allege specific facts showing retaliation because of the exercise of the prisoner's constitutional rights." *Turner v. Falk*, No. 13-CV-02957-PAB-MJW, 2014 WL 7451698, at *7 (D. Colo. Dec. 31, 2014), *aff'd*, 632 F. App'x 457 (10th Cir. 2015) (internal citation omitted).

To prove up his retaliation claim, asserted only against Defendant Mr. Quinn, Mr. Hyberg must show: (1) he was engaged in constitutionally protected activity; (2) Mr. Quinn caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) Mr. Quinn's "action was substantially motivated as a response to [Mr. Hyberg's] exercise of constitutionally protected conduct." *Id.* (quoting *Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007)).

Mr. Hyberg satisfies the first element because filing a grievance is a constitutionally protected activity. *Fogle v. Pierson*, 435 F.3d 1252, 1264 (10th Cir. 2006).

Concerning the second element, the appropriate "standard for evaluating [the] chilling effect on speech is objective, rather than subjective." *Shero v. City of Grove, Okl.*, 510 F.3d 1196, 1203 (10th Cir. 2007) (quoting *Eaton v. Meneley,* 379 F.3d 949, 954–55 (10th Cir. 2004)). In this same vein, "a trivial or de minimis injury will not support a retaliat[ion] [] claim." *Id.* For example, "[v]erbal harassment or abuse . . . is not sufficient to state a constitutional deprivation under 42 U.S.C. s. 1983." *Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979). *See also Cumbey v. Meachum*, 684 F.2d 712, 714 (10th Cir. 1982) (claim relating to a single derogatory comment made by prison guard "correctly dismissed as frivolous," as "[a] single comment clearly falls short of" stating a constitutional violation).

To satisfy the third element, Mr. Hyberg must establish that "*but for* the retaliatory motive, the incidents to which he refers . . . would not have taken place." *Id.* (emphasis added) (quoting *Peterson*, 149 F.3d at 1144). To plausibly state his retaliation claim, Mr. Hyberg must allege specific facts showing Mr. Quinn retaliated against him because Mr. Hyberg exercised a constitutional right—here, filing a grievance. *Frazier v. DuBois*, 922 F.2d 560, 562 n.1 (10th Cir. 1990). If Mr. Hyberg cannot satisfy the but for causation element, I need not consider the remaining factors. *See Dawson*, 636 F. App'x. at 757.

In his complaint, Mr. Hyberg asserts that Mr. Quinn "was upset about the cost of rebuilding" the strip out area, and also because "Mr. Hyberg filed a grievance . . . concerning strip searches." (Dkt. #1 ¶ 115.) He states Mr. "Quinn chose to punish Mr. Hyberg because Mr. Hyberg filed a grievance concerning a strip out which occurred on January 24, 2017," and did so by saying "It's just for you" when he "ordered Mr. Hyberg to go into the cubicle with the newly installed curtain." (*Id.* ¶¶ 120, 121, 125.) According

to Mr. Hyberg, "[w]hen [Mr.] Quinn stated 'it's just for you', it was said in a very demeaning and derogatory way so that others present and others in the waiting area would hear [Mr.] Quinn punishing Mr. Hyberg." (*Id.* ¶ 123.) In response, Mr. Hyberg said to Mr. Quinn "oh you think your [sic] cute installing only one curtain on a cubicle just for me." (*Id.* ¶ 122.)

Mr. Hyberg's First Amendment claim, to the extent it is based on Mr. Quinn's isolated comment, fails as a matter of law. In his response, Mr. Hyberg also asserts the strip search itself was "part of the punishment," as "it was purposely done in a way that drew a great amount of attention to me from other inmates, and in a way that ensured I'd be exposed to other inmates." (Dkt. #30 at 4.) He further asserts that Mr. Quinn was "angry at" him for causing the rebuild of the strip out area—although he does not allege how or why the cost or effort to do the build out would adversely affect Mr. Quinn, or make him angry. (*Id.*)

Liberally viewing, as I must, Mr. Hyberg's complaint to incorporate these additional arguments, they nonetheless fail to plausibly state a viable retaliation claim against Mr. Quinn. Mr. Hyberg's allegations concerning Mr. Quinn's anger over the cost of rebuilding the strip out area are conclusory and devoid of "sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678. Mr. Hyberg has wholly failed to plead enough factual contact to allow me "to draw the reasonable inference that [Mr. Quinn] is liable for the misconduct alleged." *Id.*

As for the fact of the April 17, 2017 strip search, and the manner in which it was conducted, I have already concluded there was no violation of Mr. Hyberg's limited constitutional right to privacy under the Fourth Amendment, and his allegation that Mr.

Quinn made the comment he did so as to draw undue attention to Mr. Hyberg does not change this conclusion, and fails for the very same reason that the comment by itself cannot support any alleged constitutional violation. Mr. Hyberg does not even allege it was Mr. Quinn who decided to perform the April 17, 2017 strip search, but affirmatively states he "was instructed by Mr. Rittenhouse to strip out" that day "before leaving the Seating Factory after his shift." (Dkt. #1 ¶ 52.)

And, finally, other than his bare assertion that Mr. Quinn "was angry at" Mr. Hyberg for filing a grievance in relation to the January 24, 2017 strip search—a search that Mr. Hyberg does not allege Mr. Quinn was involved in—he provides no specific facts to show Mr. Quinn "was substantially motivated" to strip search Mr. Hyberg on April 17, 2017 because Mr. Hyberg filed a grievance. Mr. Hyberg does not plead that "but for" Mr. Quinn's alleged retaliatory motive, Mr. Hyberg would not have been strip searched.

As a result, Mr. Hyberg cannot as a matter of law establish either the second or third element of his retaliation claim against Mr. Quinn, and therefore I RECOMMEND that the motion to dismiss Claim Five be GRANTED.

Because I recommend that all of Mr. Hyberg's claims be dismissed, Mr. Hyberg is not entitled to any damages, compensatory, nominal, or punitive.

## D. Defendants are Entitled to Qualified Immunity

Because Mr. Hyberg has not plausibly pled that Defendants violated any constitutional right, Defendants are all entitled to qualified immunity. *Gross v. Pirtle*, 245 F.3d 1151, 1156 (10t Cir. 2001) ("If the Plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendants qualified immunity.").

### E. Mr. Hyberg Should not be Granted Leave to Amend His Complaint

After a responsive pleading has been served, "a party may amend its pleadings only with the opposing party's written consent or the court's leave". Fed R. Civ. P. 15(a)(2). The Court has discretion whether to grant a motion seeking leave to amend, and leave should be freely granted where justice requires. *Id.*; *Anderson v. Merrill Lynch Pierce Fenner & Smith Inc.,* 521 F.3d 1278, 1288 (10th Cir. 2008). The court may exercise its discretion to deny a motion to amend upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by previously allowed amendments, or futility of the amendment. *Frank v. U.S. West, Inc.,* 3 F.3d 1357, 1365 (10th Cir. 1993). "A proposed amendment is futile if the complaint, as amended, would be subject to dismissal. . .  The relevant standard in determining whether claims are futile is the same standard that is applied to a motion to dismiss under Fed. R. Civ. P. 12(b)(6)." *Dorough v. Am. Family Mut. Ins. Co.*, No. 15-CV-02388-MSK-KMT, 2016 WL 1426968, at *2 (D. Colo. Apr. 11, 2016).

Mr. Hyberg, in his response, asks that he be allowed to amend his complaint if the Court determines he has failed to state viable claims pursuant to Rule 12(b)(6).[6] The only reason he states is that "[f]rom a review of my Complaint, and my numerous attached exhibits, it should be apparent that I can set forth plausible claims for relief if given a chance." (Dkt. #30 at 15.) I do not agree.

---

[6] Mr. Hyberg recently filed, on February 25, 2019, a "Supplement to Prisoners [sic] Complaint," in which he appears to seek leave to assert two additional retaliation claims against Mr. Quinn and Mr. Enslow. (Dkt. #40.) Mr. Hyberg's filing does not comply with the Federal Rules of Civil Procedure or this Court's Local Rules addressing amended and supplemental pleadings, nor has it been referred to me, so I decline to address it.

Mr. Hyberg's claims are all premised on the unsupportable premise that he has a complete right to privacy, i.e., that if any other inmate or prison employee of the same sex happens to view him during a strip search, that his Fourth Amendment right to privacy has been violated. Prison inmates such as Mr. Hyberg do not have a right to complete privacy. *Daughtery*, 476 F.2d at 294; *Trapp*, 2018 WL 587230 at *4; *Shapiro*, 212 F. Supp. 2d at 996 ("the Constitution does not require 'complete privacy'") (quoting *Daghtery*). His claims also appear to be based on the equally untenable notion that he has a Fourth Amendment right to protect his chest from being viewed by others during a strip search. But Mr. Hyberg himself acknowledges that a male inmate's chest or breasts does not constitute an "intimate" body part. (Dkt. #1-1 at 22.)

The facts as alleged by Mr. Hyberg himself confirm he was not subjected without justification to any group strip search (despite his efforts to try to characterize the searches as such); he was not strip searched in a public or open area where many inmates and/or prison staff had a full view of him, but in a confined area specifically designated for strip searches; and he was never strip searched in front of or near inmates or prison staff of the opposite sex. The fact that during a strip search, in which he was either in a booth or cubicle with dividing walls that went up to just below his chest, other male inmates being strip searched, or other male prison staff conducting searches or providing security, might walk by and briefly see him naked is not something from which he is protected. If this were the case, it would open a floodgate of litigation by inmates claiming that during a strip search, another inmate or prison staff of the same sex just happened to see them naked.

I conclude that any amendment to Mr. Hyberg's complaint would be futile, and therefore RECOMMEND that his request to amend be DENIED.

## Conclusion

For the foregoing reasons, it is RECOMMENDED that Defendants' Motion to Dismiss (Dkt. #16) be GRANTED. It is further RECOMMENDED that Mr. Hyberg's request to amend his complaint (Dkt. #30 at 15) be DENIED.

**IT IS ORDERED that pursuant to Fed. R. Civ. P. 72, the parties shall have fourteen (14) days after service of this Recommendation to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned. A party's failure to serve and file specific, written objections waives de novo review of the Recommendation by the District Judge, Fed. R. Civ. P. 72(b);** *Thomas v. Arn***, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions.** *Makin v. Colo. Dep't of Corr.***, 183 F.3d 1205, 1210 (10th Cir. 1999);** *Talley v. Hesse***, 91 F.3d 1411, 1412-13 (10th Cir. 1996). A party's objections to this Recommendation must be both timely and specific to preserve an issue for de novo review by the District Court or for appellate review.** *United States v. One Parcel of Real Prop.***, 73 F.3d 1057, 1060 (10th Cir. 1996).**

Date:   February 28, 2019

N. Reid Neureiter
United State Magistrate Judge